## BEWLEY & RADER LAND CO. v. WHITAKER. No. 1—
### 194 S. W. (2d) 244.

Eastern Section.    November 6, 1945.

Petition for Certiorari denied by Supreme Court, January 19, 1946.

Dale A. Mysinger, of Greeneville, Joe C. Thomason, of Knoxville, for appellant.

Susong, Parvin & Fraker and Milligan & Haynes, all of Greeneville, for appellee.

HALE, J.   The complainants sued the defendant to recover $3,150 brokerage on a sale of his land allegedly made by them.  The suit was based on a written contract dated March 14, 1944, expiring October 1, 1944, whereby defendant agreed to sell the farm (owned by him and his wife in the interests hereinafter set forth) for $21,000 net to him, giving complainants as their commissions all amounts in excess of that sum. It is alleged that on September 30, 1944, complainants negotiated a sale to. L. G. Byrd for $24,150 which defendants refused to consummate. Defendant's answer is quite lengthly, but we think it may be summarized as saying that defendant was always ready to execute a conveyance, but could not do so because his wife would not join in it; that complainants knew when they took the contract from him she would not sell, and concealed that from him; that if not chargeable with this knowledge on the date of the contract, they had such knowledge on March 16th, following, or, as an alternative,

on May 16th following (by what is known as the tobacco bed conversation); or, as an alternative which we deem most important) on June 26, 1944, when they were presented with a claimed sale to one Ferguson, which was abandoned as hereinafter set forth, and at which time Mrs. Whitaker firmly and unmistakably announced her refusal to join in any conveyance of these premises; that the subsequent alleged sale made to Byrd on September 30th (the very last day of the contract) was made with full knowledge of the inability of Mr. Whitaker to perform and that, therefore, no brokerage would be allowable.

As before indicated, no claim is based on the alleged sale to Ferguson. He was an auctioneer and farmer, lived in Hamblem County, and had been used as an auctioneer in complainants real estate operation. The record does not convince us that a bona fide sale was made to Ferguson. The record does not show that a written contract was taken. Complainant Rader testifies that the sale was made to Ferguson for "around" $25,000 for the property. He was asked why Ferguson had not pursued the matter further and replied: "Mr. Ferguson at that time had sold his farm and had to give possession of it, and rather than wait on Mr. Whitaker for his decision he went to Morristown and bought a house and lot, and hasn't bought a farm yet." This answer is not convincing and carries with it an inference of connivance and unfair dealings. Certain it is that if complainants had a bona fide sale of this property to their erstwhile associate for $25,000, it is hardly to be expected that they would relinquish it for a contract which would stand to net them $850 less.

This Ferguson transaction causes suspicion to attach to the claimed sale to Byrd on the very expiring moments of the contract. While it is shown that $21,000 tendered to Whitaker at the Bank, it is not shown who got the money.

Bryd did not testify. Altho we cannot let suspicion take the place of proof, we must say there surrounds this transaction an indefinable air of suspicion or doubt as to the good faith of the complainants.

However, there is no assignment leveled at this feature of the case. If so, it would not be necessary to consider it for the reasons hereinafter set forth.

This property consisted of three adjoining tracts, viz., tract No. 1, containing 112.8 acres in the name of Mr. Whitaker; tract No. 2, containing 6½ acres in the name of Mr. and Mrs. Whitaker under deed dated Febuary 28, 1919, creating a tenancy in common; and tract No. 3, consisting of two parcels of 3 and 17 acres, respectively, in the name of Mr. Whitaker. This property was occupied as the homestead. It results that Mrs. Whitaker had a homestead in her husband's land and a one-half undivided interest in the 6½ acre tract.

There is no evidence that Mr. Whitaker inspired his wife to refuse to join.

The defences presented by the assignments of error may be condensed into two propositions:

First, that when the contract was taken from Mr. Whitaker the complainants knew from his wife that she did not want to sell and would not join in the conveyance; therefore they knew they were taking from him a contract he could not perform.

Second, that the contract was rescinded or cancelled by Mr. Whitaker on March 16, 1944 (2 days after its execution), by his informing Mr. Bewley, one of the complainants, that the trade was off and he could not perform, in that his wife would not join in a deed; or, as an alternative it was rescinded or cancelled in May, 1944, by what may be known as the tobacco bed conversation in which defendants allegedly recognized the inability of Mr.

Whitaker to perform; or as a further alternative, that it was rescinded or chancelled on June 26, 1944, by the failure and refusal of Mr. Whitaker to execute a deed to Ferguson (to be distinguished from Byrd); or as a final alternative, that it was rescinded or cancelled by the offer of Mr. Whitaker to have his wife join in the conveyance of the 112 acre tract which stood in his own name.

The evidence does not preponderate against the Chancellor's finding on the first proposition. When the contract was taken, Mrs. Whitaker did not flatly state she would not sign the contract or join in a deed for this land, altho she did indicate an unwillingness to sell. However, this was said in such a manner as to leave open the possibility of her being persuaded to join in a deed as, if and when a sale was negotiated. Complainants realized they were on thin ice in this respect and did not insist upon her joining in the sale contract. Nor did they tell Mr. Whitaker that she was not interested in selling the farm. So we hold that at the time of the execution of the contract neither the defendant nor the complainants certainly knew Mrs. Whitaker would not join in the deed, altho there were indications that she might not do so.

Nor do we think complainants were so advised two days thereafter, altho there were growing indications that Mrs. Whitaker did not want to sell and might not join in a deed if a sale was negotiated by complainants. There was mounting evidence of her refusal to sell as indicated by the "tobacco bed conversation" had in May or June, but there was no definite, final and unyielding refusal to sign until she was presented with a deed to Ferguson before referred to. Altho this may have been a questionable if not feigned transaction, it forever placed the complainants on notice of Mrs. Whitaker's refusal to

sign the deed and the consequent inability of Mr. Whitaker to perform the contract. The purported deed to Ferguson was perpared by complainants attorneys as was the deed to Byrd. The latter deed is filed, the former is not altho complainants were requested to file it. The latter contains recitals of the ownership of the title as is heretofore set forth. We presume the former also had these recitals. At any rate, it was known that Mrs. Whitaker had rights in this property and that she would join in a conveyance thereof.

Were the complainants justified in continuing to seek a purchaser for lands when they knew a sale could not be consummated?

██ In Corpus Juris Secundum, vol. 12, Brokers, sec. 95, subsec. a (4), at pages 227, 228, it is said:

"It is essential to the broker's right to commissions, where the transaction in question fails of consummation because of a defect in, or absence of, title, that he himself is not at fault and that he does not have knowledge or notice of the defect in, or absence of, title at the time of finding the customer. While a broker is affected with notice when he is in possession of facts which are insufficient to put a prudent person on inquiry and such inquiry, if pursued with reasonable diligence, would lead to knowledge, nevertheless, in the absence of knowledge or notice, he is under no obligation or duty to acquaint himself with the title or to cause it to be examined, but may properly assume that the principal has or will furnish a good marketable title.

"The broker's knowledge of a mere outstanding encumbrance or other lien which can be removed does not defeat his right to a commission; he may properly assume that arrangements will be made to discharge the lien. A like ruling has been made as to a pending suit for specific

performance of an unauthorized contract procured from another customer by another broker where the title was in fact good and the principal did not bring the facts to the attention of plaintiff in that suit or make reasonable efforts to induce him to withdraw the suit. Also, a broker who fulfills his part of the contract will not be deprived of recovery merely by his knowledge that a perfect title cannot be conveyed by the act of the principal alone, as where he has knowledge that the principal is only a part owner or is an officer, director, and owner of the majority of the stock of a corporate owner; in such case he may reasonably and bona fide believe, and act on the assumption, that the principal will be able to bring about such action as is necessary to consummate the sale. *On the other hand, a broker who knows that the principal cannot perform without the joinder of his wife and that the wife does not intend to join, cannot, recover."* (Emphasis supplied.)

In 8 American Jurisprudence, Brokers, sec. 185, pp. 1098, 1099, it is said:

"If a broker, at the time he makes his contract with the owner, knows of defects in the employer's title, or knows of facts sufficient to put a prudent person on inquiry, which, if followed with reasonable diligence, would have resulted in such knowledge, he is not entitled to recover where the sale fails because of such facts, unless it was the intention of the parties that the employer should subsequently perfect his title in order to be able to perform."

In support of these texts, there are cited many cases from other jurisdictions as well as the case of Campbell v. Arthur H. Campbell & Co., 155 Tenn. 515, 296 S. W. 9. This case was relied upon by the Chancellor as supporting his decree.

We are of opinion that when properly understood this case is not authority for the allowance of compensation, but, to the contrary, is authority for its disallowance. The lands involved in that case were held by Campbell and wife as tenants by the entirety. The husband made the contract of sale, referring to the land as "my farm." The agents negotiated a contract of sale. The wife refused to join, and suit was brought for the commissions. It appears that the agents knew the condition of the title but it does not appear they knew she would not join. Said the Court:

"It is true that the agents knew the condition of this title—that plaintiff in error and his wife owned the land as tenants by the entirety. But this is not the ordinary case of a real estate broker negotiating the sale of land the title to which he knows is defective. In such a case, usually, the agents can recover no compensation, if the purchaser refuses to take the doubtful title. 4 R. C. L., p. 313, and cases cited.

"This is rather a case in which there has been a default in performance on the part of the seller. In our opinion, when the husband assumes to have authority to offer for sale land owned by himself and wife, this amounts to a representation that he has such authority. If under such circumstances, the husband employs a real estate broker to bring about a sale of the land, and the broker procures a purchaser for the land, we think, as against the husband, the broker is entitled to his commission. Such right of the broker against the husband cannot be defeated by the refusal of the wife to join in a conveyance. We think that in the great majority of cases, the husband attends to the business for the family, and we think the broker has a right to rely on the husband's assumption of authority and his implied representation that the wife will join

in the necessary title papers. A like conclusion has been reached in all the decisions which we have examined. Id., 155 Tenn. at pp. 516, 517, 296 S. W. at page 9.

From the language used, we think it inferable that the wife's refusal to join was not known to the brokers until after the purchaser was procured by them. This, then makes applicable the general rule before set forth.

To the same effect are Annotations in 43 L. R. A. 613 et seq.; 3 L. R. A., N. S., 576; 24 L. R. A., N. S., 1182; L. R. A., 1915 E, 720; 144 A. L. R. 921 et seq.

The result is that complainants are not entitled to commissions. We think however they are entitled to reasonable compensation on a quantum meruit basis for their services up to the time of the refusal of Mrs. Whitaker to sign the Ferguson deed. 8 Am. Jur., page 1115. Complainants offered evidence that they had been out to the defendant's home from 10 to 20 times. The time required by, and the expense incident to, these trips is not shown. The cause will be remanded for additional proof and a reference on (1) the number of trips made by complainants to defendant's premises with prospective purchasers; (2) that would be reasonable compensation for these trips; and (3) what other expenses were incurred by complainants as a reasonable incident to their efforts to sell this land—all inquiries limited to the period from the date of the contract up to the refusal of Mrs. Whitaker to sign the Ferguson deed. Complainants and surety on their prosecution bond will pay all cost in this court and, as an incident to the appeal, cost of lower court will be paid by defendant and surety on his appeal bond. Cost hereafter occuring will be adjudged by the Chancellor.

Reversed and remanded for further proceedings in accordance with this opinion.

McAmis and Burnett, JJ., concur.